UNITED STATES DISTRICT COURT

DISTRICT OF THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 24-00001-DLF |
| | ) | |
| CHRISTOPHER KENILEY | ) | |

## SENTENCING MEMORANDUM

Chris Keniley was horrified when he returned to his hotel room in the late afternoon on January 6 and saw televised reports documenting the full extent of the mayhem that had taken place earlier that day. He had little love for the former President. Instead, he saw his attendance at the former President's rally and later at the Capitol as outlets to express and demonstrate his libertarian beliefs. Poorly considered thoughts of demonstrating at the Capitol ultimately morphed into criminal conduct. His decision to first, illegally enter the grounds and, later, to go inside the United States Capitol building, were decisions he fully admits were wrong, and that now bring him before this Court for sentencing. For the reasons that follow, Keniley submits that the Court should impose a sentence of 12 months' probation with specific punitive conditions proposed below, if necessary, and order restitution of $500 to the Architect of the Capitol.

## FACTS

### A. **Keniley's History and Circumstances**

Mr. Keniley's history and circumstances are effectively set forth in the Presentence Report.



In sum, he is a 63-year-old accountant with no criminal record or indeed any brush with law enforcement whatsoever before his arrest in this matter. For the last 30 years his life has centered around supporting, financially and emotionally, his spouse Tara Murphy in her quest to explore West African music and dance and their joint efforts to

educate others in those traditions. PSR ¶¶ 36-37.[1] As Ms. Murphy explains in a video, separately

submitted to the Court as Exhibit A, the couple travel frequently to events and festivals where they

collaborate with West African musicians to showcase African musical traditions. In addition, Ms.

Murphy's company, nearly always with Mr. Keniley's assistance, engages outreach to the

community through their music and dance, focusing on children, elders, and those with disabilities.

Five years ago, the couple's life changed dramatically. Mr. Keniley's mother, Janice,

who is now 91 years-old, started experiencing mobility problems and later, developed cognitive

issues. Mr. Keniley, with the assent of Ms. Murphy and Mr. Keniley's siblings, took

responsibility for fashioning a long-term care plan in preparation for her inevitable decline.

Concluding that they would be unable to afford a home on Cape Cod appropriate to support both

themselves and Janice on their modest income, the couple chose to uproot themselves to western

Massachusetts. There they could, and did, purchase and outfit a home where they could

effectively care for Janice as she aged.

And aged Janice has. As both Ms. Murphy and Ms. Keniley explain in Exhibit A, Mr.

Keniley's mother now requires constant care both physically and emotionally. PSR ¶ 33, 34, 37,

& 39. She is particularly close to Mr. Keniley and separation from him for more than a day or

two will inevitably result in mental confusion and emotional heartbreak. Exhibit A. As

important, as Dawn Keniley relates, Mr. Keniley is the only one of the three living at home who

can assist when she falls, a not uncommon occurrence. *Id.*

### B.  The Offense

It is undisputed that Mr. Keniley's participation in the events of January 6 was limited to

making his way to the Northwest Terrace, engaging in a few rhetorical statements to no one in

---

[1]  Further information about Ms. Murphy's music and dance company (and Mr. Keniley's contributions to
it) can be found at http://ammaya.org/index.html.

particular, and then entering the Capitol briefly before leaving through the same door he entered. His actions before, during, and after the events mitigate his troublesome decision to venture on to the Capitol grounds and then enter the Capitol for a short period of time. However, factors uniformly germane to the culpability calculus for the mass of January 6 rioters place Mr. Keniley at the lower end of the spectrum. These include:

- He did not post anything about President Trump, the Stop the Steal rally, or the upcoming electoral college certification to social media in advance of January 6;

- He arrived on the grounds later in the afternoon after the outer perimeter police lines and barricades had been breached and, effectively, had vanished;

- Once on the Northwest Terrace, he did not immediately enter the Capitol. When he finally did so, he went through an open door that was by that time largely unguarded and used by dozens (if not hundreds) of rioters to enter;

- He did not engage officers on scene, nor was he ordered to exit the building by anyone;

- By 3:09 p.m. when he entered through the Senate Wing Door, altercations with police had quelled, activities by rioters were comparatively calm, and he did not witness any violent altercations, or even angry exchanges, with any officers as he walked through;

- He did not attempt to enter any offices or non-public spaces;

- He did not commit violent acts or damage property either inside or outside the Capitol, nor did he encourage violence or property destruction by others;

- He did not post his activities on social media, or otherwise laud the January 6 events to any other persons, either during or after the events of January 6.

To be sure, Mr. Keniley made statements prior to entering the Capitol that expressed his contempt for a Congress he considered corrupt. The statements, the worst of them being "go get them" in respect to Congress generally, are manifestly troublesome. Examination of the video clips

documenting those statements, however, reveals that the statements are directed at no one in particular. The statements placed in context are, at their core, rhetorical, little more than an expression of Mr. Keniley's personal frustration with his perceived corruption of politicians in general. And the proof of the pudding is in the eating: Mr. Keniley, unlike many, many others in the mob that day, did not make any effort to locate or otherwise target any specific member of Congress or any employee while inside the Capitol.

Regardless, Mr. Keniley's return to his hotel after leaving the Capitol grounds at 3:30 p.m. was eye-opening. It was only upon seeing the news reports featuring the full extent of violent clashes between rioters and police that he became aware of how malignant the riot had actually been. The scenes he saw were anathema to his personal beliefs and libertarian values. With an overwhelming sense of disgust – concededly tinged with a measure of trepidation – about what the larger mob had done, Keniley immediately took steps to disassociate himself from the event. As noted, he did not post on social media about his participation. Furthermore,   in the 21 months between the events and his arrest, he said little to loved ones and close friends, other than his profound regret in having traveled to Washington DC and having   participated in the Capitol mob that day.

Mr. Keniley's regret of what he did, as well as his unequivocal acceptance of responsibility for it, have been constant throughout the government's prosecution of him. He waived his right to a preliminary hearing immediately upon his initial appearance. Through counsel he quickly and repeatedly offered to plead guilty on terms acceptable to the U.S. Attorney's Office. Indeed, Keniley signaled his desire to plead guilty at his January 23, 2024, arraignment before this Court. It was only the government's inability to swiftly process digital and other evidence seized from him that delayed an even quicker resolution. He now stands ready, as he has been ever since he realized the gravity of what he had participated in, to bear the

consequences of his decisions that day.

The circumstances of the January 6th events were manifestly serious. Yet, the unusual features of Mr. Keniley's overall conduct at the Capitol that day, especially when paired with his individual history and characteristics, do not lend themselves to a sentence with an incarceration component. Rather, a sentence of 12 months' probation with agreed-upon restitution satisfies the purposes of sentencing without being overly punitive. A probationary sentence will provide adequate deterrence to Mr. Keniley, and to the public at large, while avoiding unwarranted sentencing disparities among other January 6th defendants.

## **ARGUMENT**

## **A SENTENCE OF 12 MONTHS' PROBATION IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY**

Undersiged counsel is keenly aware that this Court has not yet seen fit to sentence any January 6th riot participant to a non-custodial sentence. By the same token, this Court has rightly noted that each January 6th defendant brings a different constellation of facts and circumstances that warrant independent consideration, and that not every collection of circumstances will warrant a sentence of incarceration. *United States v. Elliot Bishai*, Criminal No. 21-00282-TSC, Sentencing Transcript (D.E. 93) at 41. Defendant submits that the nature of Mr. Keniley's conduct, in conjunction with his otherwise law-abiding history and personal circumstances, presents the outlying case that does support a sentence of probation. This is particularly true when the mitigating facts in his history are paired with the total absence of aggravating factors in connection with the offense. For example, it is undisputed that Mr. Keniley:

- Did not post anything about President Trump, the Stop the Steal rally, or the upcoming electoral college certification to social media in advance of his trip to Washington DC;

- Did not bring a gas mask, tactical gear, or weapons to Washington or the Capitol;

- Did not encourage others to go to the Capitol or, once on the grounds, to go inside;

- Did not go inside the Capitol building immediately, but rather long after the initial breaches and only when it appeared clear that hundreds of others were filtering in and out of the Capitol;

- Did not participate in violence, property destruction, taunting or otherwise impeding officers in their work;

- Did not post his activities on social media or otherwise laud the January 6th events to any other persons;

- Did not destroy evidence or otherwise obstruct investigations, but instead quickly notified the government and this Court of his intention to accept responsibility and plead guilty to the charged offenses; and

- Has been trouble-free since the January 6th event and remains in complete compliance with the strictures of his pretrial conditions.

Analysis of sentencing decisions by other sessions of the District Court demonstrate the appropriateness of – indeed, a strong preference for - probationary sentences for low-level offenders, even where the circumstances and conduct were far more egregious than is present in Mr. Keniley's case:

- *United States v. Eliel Rosa*, 21-cr-00068-TNM: Defendant sentenced to 12 months' probation. Rosa accepted responsibility early on, did not pre-plan or coordinate activities, and did not go far into the U.S. Capital building.

- *United States v. Jordan Stotts*, 21-cr-00272-TJK: Defendant sentenced to 24 months' probation where he shouted at MPD officers and posted non-remorseful comments following January 6th.

- *United States v. Julia Sizer*, 21-cr-00621-CRC: Defendant sentenced to 24 months' probation. Sizer was inside the Capitol Building for approximately 2 minutes and she recorded events on her cellphone.

- *United States v. Jacob Lewis*, 21-cr-0100-CRC: Defendant sentenced to 12 months' probation. Lewis traveled from his home in California to Washington DC, entered the Senate Wing doors, and strolled through the Capitol to exit from the South doors. He posted photos from the Capitol grounds on his Instagram account.

- *United States v. Marissa Suarez and Patricia Todisco*, 1:21-cr-00205-DLF. The two codefendants were sentenced to 36 months' probation. The pair entered the Capitol through the Senate Wing doors and into offices within while chanting "Stop the Steal."

The next day, one of the women texted, "[w]hen we found out pence f**ed us we all stormed the Capitol building and everyone forced entry and started breaking shit--it was like a scene in a movie."

- *United States v. Gary Edwards*, 21-cr-00366-JEB: Defendant sentenced to 12 months' probation. Edwards was inside the Capitol building for approximately 24 minutes and during his stay in the Capitol entered an office.

- *United States. v. Timothy Allen Hart,* 1:21-cr-00540-DLF: Defendant sentenced to 36 months' probation with 45 days of home detention. Hart was amongst the first people to breach the Capitol grounds perimeter and did so by helping move barricades, then entered the Capitol building for twenty minutes where he was observed smoking marijuana in the Rotunda.

- *United States v. Douglas F. Macrae*, 22-cr-00181-JEB: Defendant sentenced to 12 months' probation. Macrae entered the Capitol building while filming and taking pictures of the chaos surrounding him, which he posted online, and boasted in a caption on Facebook "I made it deep into the Capitol Building."

- *United States v. Paula Conlon*, 22-00171-JMC: Defendant sentenced to 12 months' probation. Conlon was inside the Capitol building for approximately 3 minutes, where she posted comments & photos to social media. After exiting, she is seen telling police in tactical gear to "back off."

- *United States v. Lawrence Ambrose*, 1:22-cr-00302-DLF: Defendant sentenced to 36 months' probation. Ambrose decided to attend the Stop the Steal rally immediately upon hearing about it on the radio. He was among the first couple of hundred people to get to the Capitol and went into the Senate Wing door at 2:24 p.m., before Senators and Congressmen had been evacuated, because he wanted to "make history." He proceeded to the Rotunda and the Speakers' Lobby where he was fist-pumping before exiting the House door a half-hour later.

- *United States v. Ian Ross Horvath*, 1:22-cr-00344-DLF: Defendant sentenced to 36 months' probation. Horvath entered the Capitol through the Senate Wing Door and proceeded to the Crypt and later the Rotunda, staying a total of 30 minutes and sometimes livestreaming. Upon exiting, and after seeing police officers trying to clear the building, Horvath encouraged others to enter, stating "come on in, all are welcome." He later deleted evidence of his presence from his Facebook account.

These sentences reflect a proportionality in sentencing that is essential to separating lower-level offenders from more culpable participants. Mr. Keniley's actions most closely resemble Edwards' conduct (although Mr. Keniley's did not enter any office), Macrae's conduct (although Mr. Keniley did not boast or even post online about his entrance into the Capitol), and Conlon's

conduct (although Mr. Keniley did not taunt or even engage police). In sum, Mr. Keniley's conduct ranks below, in some cases far below, the culpability of each of the defendants cited above where other sessions of this court have determined a noncustodial sentence was warranted.

The analysis of comparable offense conduct above is *before* considering the mitigating circumstances of Mr. Keniley's history and current circumstances. Those additional factors further ameliorate the sentence to be imposed. The Presentence Report and Exhibit A document that Mr. Keniley is far out of the mine run of January 6th defendants. His life does not center around perceived grievances; rather, he and his spouse have focused on positive change in themselves and others through mediation, music and dance. They are committed to their local community and expanded outreach and education, including to marginalized communities, through their music and dance efforts.

Equally important is the outsized role Mr. Keniley has voluntarily and enthusiastically undertaken to care for his elderly and ailing mother, Janice. Both Ms. Murphy and Mr. Keniley's sister, Dawn, are at a loss as to how they and Mr. Keniley's mother will cope with Mr. Keniley's absence, even for a short period of time. PSR ¶¶ 34, 37; Exhibit A. The Sentencing Commission has long recognized the role of family ties and responsibilities in fashioning a sentence, and has even allowed that where, as here, those responsibilities are extraordinary, they can be the basis for a departure from an otherwise applicable guideline. U.S.S.G. §5H1.6. Here, of course, a sentence of probation is authorized and the Court need not depart to achieve a sentence that adequately takes into account such circumstances. The Court can, and should, impose a noncustodial sentence that recognizes the central role Mr. Keniley has, and does, play in his mother's life. This Court has recognized that history and circumstances will support a sentence far less than that otherwise warranted by the unadorned offense conduct. In sentencing defendants Elias Irizarry and Elliot Bishai to fourteen (14) days each in *United States v. Sherrill,*

- 8 -

*et al.*, Criminal No. 21-00282-TSC, the Court underscored the seriousness of the pair's offense. The pair:

- Entered the grounds in the early stages of the riot (far before Mr. Keniley did);

- Witnessed ongoing, violent, clashes between police and rioters (which Mr. Keniley did not);

- Exhorted that "this is civil war" from the top of the steps to the crowd (which Mr. Keniley did not);

- Entered the Capitol by climbing through a recently broken window (Mr. Keniley entered and exited a door through which dozens of other protesters were streaming);

- Spent 27 minutes inside the Capitol, where they went to different levels, went into a Senate Conference Room, and posed on statues (Mr. Keniley simply walked down to the Crypt and back);

- Stayed on the Capitol grounds for approximately four hours until forcibly cleared by police, during which one of the men sat on a police car to pose for a picture (Mr. Keniley left immediately after exiting the Capitol).

The Court nevertheless looked past the clearly disturbing conduct – behavior far more egregious and culpable than that committed by Mr. Keniley – to take into account salient and compelling features of each of the pair's history and circumstances, deciding to impose a sentence that was half of the government's recommendation (30 days imprisonment) for Bishai and one-third of is recommendation (45 days imprisonment) for Irizarray.

As it did with Bishai and Irizarray, the Court should now consider the context of Mr. Keniley's actual offense conduct while considering the sharply mitigating factors of his history and circumstances. A sentence of 12 months' probation, permitted by the statute and consistent with Sentencing Commission principles, better fits Mr. Keniley's actual conduct and far more

accurately balances the section 3553(a) factors in his case. It is a sentence that is "sufficient, but not greater than necessary" while vindicating Congress's direction that the Court "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The Court should therefore impose it.

Should the Court nevertheless determine that additional punitive measures are required, defendant requests that the Court consider some or all of the following measures in lieu of a direct commitment to the Bureau of Prisons:

- **Increased Community Service Requirement:** As noted above and in Exhibit A, Mr. Keniley, through his spouse's music and dance company, is dedicated to community outreach and service. The Court could double the ordinary benchmark of 60 hours of community service to a total of 120 hours, a significant sanction that would promote and properly balance the goals of 18 U.S.C. § 3553(a).

- **Home Detention as a Condition of Probation**: Probation is a significant sentence by itself because both the standard and special conditions that are typically imposed substantially restrict an individual's liberty. *Gall v. United States*, 552 U.S. 38, 48-49 (2007). A sentence of home detention is an exponentially more significant sentence than a probationary period with less restrictive conditions, and therefore properly balances any need for increased punishment the Court deems appropriate while permitting Mr. Keniley to continue to care for his elderly mother.

- **Intermittent Confinement as a Condition of Probation:** The Sentencing Commission has expressly provided that a term of intermittent confinement will serve the purpose of incarceration. 18 U.S.C. § 3563(b)(10). Specifically, the Court may provide that the defendant "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." The Probation

Department for the District of Massachusetts, where Keniley will be supervised, has advised

undersigned counsel that intermittent confinement is only available as a condition of supervised

release but the place of such confinement will be determined by the Bureau of Prisons. It may be

at a local jail, a Residential Reentry Center (in Boston or Springfield, Massachusetts), or possibly

(but less likely) at a Bureau of Prisons facility. *See* Memorandum of Supervisory U.S. Probation

Office Tricia Marcy, attached hereto as Exhibit B.

## CONCLUSION

For the foregoing reasons, Mr. Keniley respectfully requests that the Court sentence him

to a term of 12 months' probation, a sentence consistent with the statute and encouraged by the

Sentencing Commission principles. The Court can, if necessary, impose additional conditions to

accurately balance the section 3553(a) factors. The Court should order $500 restitution to the

Architect of the Capital as provided for in the parties' plea agreement. The Court should decline

to impose a fine.

CHRIS KENILEY
By his attorney,


/s/ Timothy G. Watkins
Timothy G. Watkins
Federal Defender Office
District Of Massachusetts
Western Massachusetts Office
1 Federal St, Building 101, Suite 3W
Springfield, MA 01105


## CERTIFICATE OF SERVICE

I, Timothy G. Watkins, hereby certify that this document filed through the ECF system will be
sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on
July 16, 2024.

/s/ Timothy G. Watkins
Timothy G. Watkins